## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 09 2016, 6:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE

Ann C. Coriden
Dominic W. Glover
Columbus, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

A.C.B.,

*Appellant-Petitioner,*

v.

D.E.,

*Appellee-Respondent.*

June 9, 2016

Court of Appeals Case No. 72A04-1511-AD-2034

Appeal from the Scott Circuit Court

The Honorable Roger L. Duvall, Judge

Trial Court Cause No. 72C01-1502-AD-4

**Altice, Judge.**

## Case Summary

[1] D.D. (Mother) and D.E. (Father) are the biological parents of B.K.E. (Child), born in 2010. Mother married A.C.B. (Stepfather) in December 2012. About two years later, Father initiated a paternity action. Mother and Stepfather

responded with Stepfather filing a petition to adopt Child, and Father objected to the petition. Following a hearing, the trial court denied the adoption petition. Stepfather now appeals arguing that Father's consent was not required because Father had not provided support for Child or communicated significantly with Child for the two years prior to the filing of the adoption petition.

We affirm.

### Facts & Procedural History

Mother and Father were in a relationship that resulted in the birth of Child in May 2010. The couple lived together off and on due to financial issues, but they actively raised Child together until the relationship ended in February 2012, when Father was unfaithful. Thereafter, Mother began a relationship with Stepfather and married him in December 2012.

Although bitter toward Father after the break up, Mother maintained a good relationship with Father's parents (Grandparents) and would leave Child at their house at least once a week while she was at work. Through December 2012, Mother allowed Father to see Child only at Grandparents' home, which Father did regularly. Mother also made it clear to Father that he was not to contact her directly. For example, in response to a text message from Father, Mother wrote on June 2, 2012: "[Child] is perfect as always! Next time you want to know how she is doing I will let your parents know and you can ask them. I'm going to tell you ONE more time .. [sic] do not contact me you lying

piece of crap." *Exhibits* at 52. Other text messages and calls were ignored by Mother, including a text from November 2012 in which Father sought information in order to continue covering Child on his insurance in 2013.

[5] Father and his family celebrated Christmas with Child on December 23, 2012, just over a week after Mother married Stepfather. The following month, Mother met with Grandparents and "made it very clear to [Grandparents] that [Father] was not to be in physical contact anymore with [Child]". *Transcript* at 37. Grandparents were visibly upset by this request. While Mother did not directly threaten to withhold visits if they did not comply, Grandparents felt that this was implied and therefore honored her request in order to maintain a relationship with Child.

[6] Beginning in January 2013, Father no longer visited Child due to Mother's request. His texts to Mother inquiring about visitation went unanswered. Father regularly asked Grandparents about Child and on at least two or three occasions spoke with Child directly while she was with Grandparents. Father also bought gifts for Child that were kept at Grandparents' home and kept secret from Mother. On a few occasions, Father provided envelopes with money for Grandparents to give to Mother, which Mother refused. She consistently rejected anything from Father.

[7] Father testified that he was devastated when Grandparents told him that Mother would no longer permit his visits. He believed this would be short term

and that once he got his finances in order[1] he could hire a lawyer to go to court and establish parenting time and child support. He relied on indirect contact through Grandparents in the meantime and last spoke directly with Child in July 2014.

[8] In the fall of 2014, Father learned that he could establish child support in coordination with the prosecutor's office and without having to hire an attorney. Accordingly, on December 4, 2014, Father filed an application for Title IV-D child support services and initiated an action in January to establish support for Child under cause no. 72C01-1501-JP-1 (the Paternity Action).

[9] One month later, on February 17, 2015, Stepfather filed a petition to adopt Child, who was four years old at the time. Mother consented to the stepparent adoption, and Father filed an objection to the petition. Around this same time, Mother stopped Child's visits with Grandparents.

[10] The trial court held an evidentiary hearing on July 17, 2015. At the beginning of the hearing, the trial court noted the pending Paternity Action but indicated, with agreement of the parties, that the instant adoption case should be addressed first due to its potentially determinative effect. Mother, Father, Stepfather, and Grandparents testified at the hearing. The trial court then took the matter under advisement and issued its order on October 30, 2015, denying Stepfather's petition for adoption. In its order, the trial court issued detailed

---

[1] Father filed bankruptcy in 2014.

findings and ultimately found that for the two years prior to the filing of the adoption petition, Father had no significant contact with Child and made no significant effort to support her. The court further found it apparent that after December 2012 Mother wanted to end all involvement by Father in her and Child's lives. In determining whether Father's consent to the adoption was required, the court indicated that the "critical issue [was] whether Mother's actions thwarted Father's communication with the child and the effect of her refusal to accept any offered support." *Appendix* at 19. The court continued:

26.    It is not sufficient for Mother to maintain that Father could have physically come over to [Grandparents'] house or that she never explicitly stated that [Grandparents'] visitation would be cut off if Father visited. The fact is that over the period from Christmas, 2012 until [Stepfather] filed his petition for adoption, the Mother made very clear that she wanted Father to stay away from the child and insisted that Father stay away from the Child.

27.    The parties and family fell into a routine where the grandparents could visit, Father would stay away and Mother was content with Father having nothing to do with the child and refused the limited offers of support and insurance.

28.    Father certainly could have been more attentive to his parental duties and should not have taken what the Court would characterize as the easy way out by acquiescing to this arrangement. But, the burden is upon [Stepfather] and Mother to show that Father's consent is not required and it is a very high burden.

29.    This Court on other occasions has found that a non-custodial parent's consent is not required even when the custodial

parent and adopting step parent have interfered with the efforts of communication. Those cases, however, have been characterized with behavior by the non-custodial parent that justified that interference such as drug use or criminal activity.

30.    Mother's anger over Father's affair and the breakup of the relationship, no matter how understandable on Mother's part or inexcusable on Father's part, do not constitute a reason to sever from the Father his relationship with his child.

31.    It is somewhat ironic that when Father finally takes the steps to assert his rights with his daughter in December, 2014, which [sic] fact then prompted the adoption action a month later.

32.    The Court finds that Mother's actions to restrict Father's contact with the Child and her refusal to accept the few offers of support and insurance benefits are such that Father's consent to the adoption may not be dispensed with and is required. The petition for adoption is denied.

*Id.* at 19-20. Stepfather now appeals, arguing that the trial court erroneously determined that Father's consent was required.

### Standard of Review

We will not disturb a trial court's ruling in an adoption proceeding unless the evidence leads to but one conclusion and the trial court reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). On review, we presume the trial court's decision is correct and consider the evidence in the light most favorable to that decision. *Id.* Where, as here, a trial court enters findings of fact and conclusions of law, we determine whether the evidence

supports the findings and then whether the findings support the judgment. *Id.* We will not set aside the findings or judgment unless clearly erroneous. *Id.* Factual findings are clearly erroneous only where the record contains no facts or inferences to support them and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *Id.*

## Discussion & Decision

[12] Stepfather argues that it was erroneous for the trial court to require Father's consent where Father had only three phone calls with Child and provided no support for her during the two years prior to the filing of the adoption petition. While acknowledging that actions by the custodial parent to thwart or rebuff a non-custodial parent's communication and support efforts are a relevant consideration, Stepfather argues that Father had the opportunity for direct access to Child at all times through Grandparents and, further, that Father only made a few offers of support.

[13] In Indiana, the consent of a biological parent to the adoption of their child is not required under certain exceptions enumerated in Ind. Code § 31-19-9-8. The exceptions relevant here provide that consent is not required from:

> A parent of a child in the custody of another person if for a
> period of at least one (1) year the parent:
>
> > (A) fails without justifiable cause to communicate
> > significantly with the child when able to do so; or

> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

I.C. § 31-19-9-8(a)(2). As this provision is written in the disjunctive, consent is not required if either failure to communicate or failure to provide support is established. *In re Adoption of B.R.*, 877 N.E.2d 217, 218 (Ind. Ct. App. 2007). The burden rests squarely upon the petitioner seeking to adopt, here Stepfather, to prove the statutory criterion by clear and convincing evidence. *See In re Adoption of T.L.,* 4 N.E.3d at 662.

[14] On appeal, Stepfather expresses agreement with the vast majority of the trial court's findings of fact and indicates disagreement with only one. Specifically, he disagrees with the trial court's view that Mother's statement to Grandparents was an effort to thwart Father's contact with Child via an implied threat to Grandparents. Stepfather, however, does not ask us to review this finding because he recognizes that would constitute an improper request to reweigh the evidence. Rather, he argues that a single statement made by Mother in early 2013 cannot constitute a sufficient justification for Father's two years of failure to communicate significantly with Child.

[15] As recognized by Stepfather, "[e]fforts of a custodial parent to hamper or thwart communication between a parent and child are relevant in determining the ability to communicate." *In re Adoption of A.K.S.*, 713 N.E.2d 896, 899 (Ind. Ct. App. 1999) (trial court incorrectly determined that father's consent for stepparent adoption was not required where evidence showed that mother

refused out-of-state father's attempts to communicate with son via letters), *trans. denied*. *See also D.D. v. D.P.*, 8 N.E.3d 217, 221 (Ind. Ct. App. 2014) (trial court did not err by finding that mother hampered and thwarted father's attempts to communicate where over a six-year period mother ignored almost all of father's emails and seemed interested only in terminating father's parental rights).

[16] Contrary to Stepfather's assertion on appeal, Mother's attempts to hamper and thwart communication between Father and Child went beyond a single statement and began well before January 2013. When Mother and Father's relationship ended before Child's second birthday, Mother placed significant limitations on Father's time with Child, allowing him to see his daughter only during her weekly visits at Grandparents' home. Further, in 2012, Mother angrily rebuffed Father's attempts to directly communicate with her regarding their young child and, on other occasions, simply ignored his communications. After marrying Stepfather, Mother met with Grandparents and made it clear to them that Father was not to be in physical contact with Child anymore and could not visit during their time with Child. Grandparents regretfully complied with this request because they believed that their visits would be cut off if they did not.[2] Thereafter, Mother ignored Father's texts regarding seeing his child. As the trial court observed, it was apparent that "Mother wanted to end all involvement by Father in her and the child's life." *Appendix* at 16.

---

[2] In fact, Mother ceased visits with Grandparents after the adoption petition was filed because Grandparents indicated that they should have just let Father come over all along.

[17] Despite Mother's efforts, Father continued to maintain some minimum contact with Child through his parents. He spoke with her on at least three occasions while in Grandparents' care, sent her gifts for use at Grandparents' home, and regularly checked in with Grandparents regarding Child's wellbeing.

[18] With respect to support, the record establishes that Mother similarly rebuffed all efforts by Father. He attempted to send money through his parents, but Mother refused the envelopes and indicated that she did not want anything from him. Father sent a text to Mother seeking information to continue to cover Child on his insurance in 2013, but she did not respond. Mother emphasized at the hearing that she did not want or need his money.

[19] Without Mother's knowledge, however, Father did give gifts to Child on her birthday and holidays to keep and use at Grandparents' house. During this time, Father worked on getting his finances in order and in late 2014 began efforts to establish child support and parenting time through the court. This endeavor was then met with Stepfather's petition to adopt Child.

[20] Under these facts and circumstances, we cannot say that the trial court erred by concluding: "Mother's actions to restrict Father's contact with the Child and her refusal to accept the few offers of support and insurance benefits are such that Father's consent to the adoption may not be dispensed with and is required." *Id.* at 20. While Father certainly could have done more, it was within the trial court's discretion to determine that Mother's interference and outright refusal to work with Father should not be rewarded by dispensing with

his consent. Accordingly, the trial court did not err in denying Stepfather's petition for adoption.

[21] Father asks that in affirming the trial court we also award appellate attorneys' fees to him. He argues that Stepfather's appeal was a "frivolous effort to 'out litigate' Father" and, therefore, fees are appropriate under Indiana Appellate Rule 66(E). *Appellee's Brief* at 12.

[22] Appellate Rule 66(E) provides, in pertinent part, that an appellate court "may assess damages if an appeal…is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Our discretion to award attorneys' fees under this rule is limited to "instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). We must use extreme restraint when exercising our power under the rule because of the "potential chilling effect upon the exercise of the right to appeal." *Id*. Further, with respect to claims of substantive bad faith, as asserted here by Father, the party seeking attorneys' fees "must show that the appellant's contentions and arguments are utterly devoid of all plausibility." *Id*. Father has not made such a showing here, and we decline his request for an award of appellate attorneys' fees under Appellate Rule 66(E).

[23] Alternatively, Father asks that we remand with instructions for the trial court to determine an award of appellate attorneys' fees pursuant to Ind. Code § 31-14-

18-2.[3]  His argument is not well developed.  Moreover, because Father appears to have never requested an award of attorneys' fees below, we agree with Stepfather that the issue is not properly before us.

[24] Judgment affirmed.

[25] Bailey, J. and Bradford, J., concur.

---

[3] I.C. § 31-14-18-2(a) provides that a trial court may order a party to pay:

> (1) a reasonable amount for the cost to the other party of maintaining an action under this article; and

> (2) a reasonable amount for attorney's fees, including amounts for legal services provided and costs incurred, before the commencement of the proceedings or after entry of judgment.